**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

TRUSTEES OF THE PLUMBERS AND     :
GASFITTERS LOCAL 5 RETIREMENT,     :
SAVINGS FUND, ET AL.     :
    :
      v.     :    Civil No. CCB-12-730
    :
    :
CONDITIONED AIR SYSTEMS, INC.,     :
ET AL.     :
    :

## MEMORANDUM

Plaintiffs (collectively, "the Local 5 Funds") brought suit under the Employee Retirement

Income Security Act of 1974 ("ERISA") to recover delinquent contributions to various employee

benefits funds from defendants Conditioned Air Systems, Inc. ("Systems") and Complete Air

Solutions, Inc. ("Solutions").  The Local 5 Funds' motion for summary judgment is currently

pending before the court.  The parties have fully briefed the issues, and no hearing is necessary.

*See* Local Rule 105.6.  The motion will be granted in part and denied in part.

## BACKGROUND

Plaintiffs are a union, Plumbers Local Union No. 5 ("Local 5"), and the trustees of

various employee benefit funds covered by ERISA that are associated with Local 5.  On

September 28, 2008, Systems signed a Letter of Assent, (Killeen Decl. Ex. 1, ECF No. 28-23),

agreeing to be bound by the collective bargaining agreement ("CBA") between Local 5 and the

Mechanical Contractors Association of Metropolitan Washington, Inc. ("the Association"),

(CBA, Killeen Decl. Ex. 2, ECF No. 28-24).  By the Letter of Assent, Systems also agreed to be

bound by the Restated Agreements and Declarations of Trust ("Trust Agreements") governing

each of the funds on behalf of which suit was brought here.  (Letter of Assent.)

Under the CBA and Trust Agreements, Systems was required to make monthly contributions to the Local 5 Funds at a rate prescribed by the CBA for each hour worked by a covered employee.  (*See, e.g.*, Trust Agreements, Killeen Decl. Ex. 4, ECF No. 28-26, at 4; CBA at 23 (¶ 166).)  In addition, Systems was obligated to submit monthly reports to the Association, Local 5, and the trustees of the Local 5 Funds that contained the names of each employee whose wages were covered by the CBA that had been employed during the preceding calendar month and the number of hours each had worked.  (Trust Agreements at 4; CBA at 23 (¶ 169).)

In December 2010 Systems entered into a consent judgment ("the Settlement Agreement" or "the Agreement") with the Local 5 Funds under which it acknowledged that it owed $88,041.89 in delinquent contributions, interest, liquidated damages, costs, and attorneys' fees for the period of February 2009, June through August 2009, and October 2009 through August 2010.  (Settlement Agreement, Killeen Decl. Ex. 9, ECF No. 28-31, ¶ 2.)  It agreed to pay $63,273.66 with interest assessed on that amount at a rate of ten percent per annum.  (*Id.* ¶ 3.) The Local 5 Funds agreed to waive the remaining $24,768.23 in liquidated damages as long as Systems made every scheduled payment under the Settlement Agreement and submitted all future remittance reports and contributions as required by the CBA and Trust Agreements.  (*Id.* ¶ 4.)  The parties agreed that if Systems failed to comply with any part of the Agreement the entire amount of waived liquidated damages would be reassessed and the entire amount still due under the Agreement would be declared immediately due and payable.  (*Id.*)  Systems failed to comply with the terms of the Agreement by failing to submit remittance reports and make contributions for each succeeding month.  (Def.'s Opp'n Ex. 1, ECF No. 35-2.)

When the parties entered into the Settlement Agreement, an audit was ongoing to review Systems' payroll records.  (Settlement Agreement ¶ 10.)  The audit reviewed Systems' records for the period between and including January 2008 and July 2011.  (Coyle Decl., ECF No. 28-32, ¶ 3.)  It ultimately revealed $168,790.76 in unpaid contributions to the Local 5 Funds for that period of time.  (Coyle Decl. ¶ 4; Audit Report, Coyle Decl. Ex. A, ECF No. 28-33.)  In addition to the unpaid contributions revealed by the audit, Systems also failed to meet its obligations accruing in the months after the audit period.  (Killeen Decl., ECF No. 28-22, ¶¶ 11, 13, 17, 24.)

The Local 5 Funds filed this action in March 2012 seeking delinquent contributions that accrued from January 2008 through the date of judgment, liquidated damages and interest for the same period through the date of payment, an order that the defendants submit payroll records for an audit of the period from August 1, 2011, through the present, unpaid dues and work assessments, and injunctive relief requiring the defendants to comply with their obligations in the future.  (Compl., ECF No. 1, at 12.)  The Local 5 Funds now ask this court to enter summary judgment in their favor for $821,955.46 in unpaid contributions, liquidated damages, and interest covering the period from January 2008 through May 2013.  They also request that the court grant summary judgment as to Solutions' liability as Systems' alter ego and as to Solutions owner Richard Putnam's individual liability.

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Whether a fact is material depends upon the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## I. Defendants' Liability under ERISA

### A. Conditioned Air Systems, Inc.'s Liability

ERISA mandates that employers obligated to make contributions to multiemployer benefit plans under the terms of such plans or a collective bargaining agreement "shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. When employers fail to make required contributions, ERISA empowers beneficiaries, such as the plaintiffs in this case, to bring civil actions to recover benefits, enforce rights under the relevant plan or agreement, or clarify future benefits. *Id.* § 1132(a)(1)(B). Where a plan prevails in enforcing its rights to

contributions, it can recover not only unpaid contributions, but also interest, liquidated damages, and attorneys' fees.[1]  *Id.* § 1132(g)(2).

It is undisputed that Systems was under an obligation to submit monthly remittance reports and make contributions to the Local 5 Funds by virtue of its assent to be bound by the CBA and the Trust Agreements.  (*See, e.g.*, Letter of Assent.)  ERISA mandates that it comply with those obligations.  29 U.S.C. § 1145.  Where Systems has failed to meet its obligations, therefore, plaintiffs are entitled to recover damages as set forth under ERISA. 29 U.S.C. 1132(g)(2); *see also Int'l Painters and Allied Trades Indus. Pension Fund v. Capital Restoration & Painting, Co.*, 919 F. Supp. 2d 680, 685-86 (D. Md. 2013) (noting that "[t]he Supreme Court has found that these sections [§§ 1132(g) and 1145] 'provide trustees of multiemployer benefit plans with an effective federal remedy to collect delinquent contributions.'" (quoting *Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 541 (1988))).

### B.  Complete Air Solutions, Inc.'s Liability

According to Richard Putnam, Systems ceased operations in mid-March 2012.  (Putnam Aff. ¶ 25.)  Putnam registered Solutions, however, in December 2011.  (Solutions Articles of Incorporation, ECF No. 28-4, at 4.)  Plaintiffs claim that even if Systems nominally ceased operating by April 2012, it was actually continuing operations as Solutions.  Thus, although Solutions never assented to be bound by the CBA or Trust Agreements, the Local 5 Funds seek to hold it jointly and severally liable with Systems for delinquent contributions and related damages under the theory that the two entities are "alter egos" or "single employers."

---

[1] Plaintiffs state in their memorandum that they will seek attorneys' fees and costs at a later time.  (Pl.'s Mem. at 12 n.2.)

The "alter ego" doctrine prevents an employer from avoiding his labor obligations simply by altering his corporate form but with no substantial change in ownership and management.[2] *See Alkire v. Nat'l Labor Relations Bd.*, 716 F.2d 1014, 1018 (4th Cir. 1983); *Maryland Elec. Indus. Health Fund v. Kodiak Util. Constr., Inc.*, 289 F. Supp. 2d 698, 702 (D. Md. 2003). If two entities are alter egos, they are each liable for the labor obligations of the other. *Alkire*, 716 F.2d at 1018. The Fourth Circuit has set out a two-part test to determine whether an entity is the alter ego of the original employer. First, the court must determine "whether substantially the same entity controls both the old and new employer." *Id.* at 1020; *see also Maryland Elec. Ind. Health Fund*, 289 F. Supp. 2d at 702. In making this inquiry, courts have looked at a variety of factors, including: "continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus." *Id.* (quoting *Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998) (internal quotation marks omitted)); *Trustees of the Heating, Piping and Refrigeration Pension Fund v. Engineering Contractors, Inc.*, 2011 WL 4711925, at *2 (D. Md. 2011).[3] If the two entities are substantially the same, the court must then determine whether changing the corporate form would provide an "expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations." *Alkire*, 716 F.2d at 1020. Similarly, two entities are considered a "single employer" where they have common ownership, interrelation of operations, common management, and centralized control of labor relations. *Vance v. Nat'l Labor Relations Bd.*, 71 F.3d 486, 490 (4th Cir. 1995). The ultimate

---

[2] Defendants claim this court should apply Maryland law to decide alter ego liability. (Def.'s Opp'n at 20-22.) There is no support for applying state law in the cases the defendants cite or in any other cases proffered by the parties.
[3] Unpublished cases are cited only for the soundness of their reasoning not for any precedential value.

question in determining alter ego status is "whether a successor corporation is really the predecessor corporation by another name," *Maryland Elec. Indus. Health Fund*, 289 F. Supp. 2d at 702, and the ultimate question in determining single employer status is whether the two entities are in an "arm's length" relationship, *Vance*, 71 F.3d at 490. Under either analysis, Systems and Solutions are jointly and severally liable for Systems' labor obligations.

Most indicative of Solutions' alter ego or single employer status are the emails Systems sent, in January 2012, informing two of its customers that it was "changing its name to Complete Air Solution Inc." and that Systems was "now doing business as of 1-1-2012 as Complete Air Solutions, Inc." (Email to Flower Hill Community Center ("FHCC"), ECF No. 28-5, at 1; Letter to Maryland Stadium Authority, ECF No. 28-6.). Defendants attempt to characterize these emails as informing customers that Systems was ceasing operations, but there is nothing in the record to support such a reading and such an inference would be unwarranted. Instead, they demonstrate that Systems was only undergoing a name change. This understanding is further supported by a later email in which Richard Putnam, the owner of both entities, asked a client to make a check out to "*our new name* Complete Air Solutions Inc." (FHCC Emails, May 21, 2012, ECF No. 28-10, at 1 (emphasis added).)

In addition, the record demonstrates that Solutions and Systems had common ownership and similar management, and shared a physical address and email addresses. (Putnam Aff., ECF No. 35-1, ¶¶ 4-5, 9[4]; Solutions Articles of Incorporation; Solutions' Resp. to Pl.'s First Request for Admis., ECF No. 28-8, at Request Nos. 4, 5; Systems' Supp. Resp. to Pl.'s First Set of Interrog., ECF No. 28-9, at Interrog. No. 3; *compare* DiFranco Email to FHCC, November 3,

---

[4] The plaintiffs challenge the admissibility of several statements included in Mr. Putnam's affidavit. (Reply, ECF No. 39, at 3-6.) The court will assume, without deciding, that the entire affidavit is admissible because its acceptance does not prejudice the plaintiffs' position.

2011, ECF No. 28-14, *with* DiFranco Email to FHCC, May 4, 2012, ECF No. 28-15 (using the same email addresses for both Systems and Solutions correspondence).) As of at least May 2012, Solutions was invoicing for work that was still under contract to Systems. (Maryland Stadium Authority Email Regarding Systems Invoices, ECF No. 28-7; FHCC Emails, ECF No. 28-10, at 2; *see also* Putnam Aff. ¶ 30.) In addition, Solutions used documents in its invoicing still labeled with Systems' name. (Time Sheet, October 3, 2012, ECF No. 28-12.) Plaintiffs also have provided documents demonstrating that at least two individuals employed by Systems were performing work after the date the defendants claim Systems ceased operations, suggesting they worked for Solutions. (Systems' Supp. Resp. to Pl.'s First Set of Interrog. at Interrog. No. 8 (listing Michalena DiFranco and Dwayne Myer as employees of Systems); Time Sheet, October 3, 2012, ECF No. 28-12 (listing hours worked by Dwayne Myer in October 2012); DiFranco Email to FHCC, May 4, 2012, ECF No. 28-15 (indicating DiFranco sent an email on behalf of Solutions in May 2012).) Putnam admits in his affidavit that the two employees worked for Solutions, but claims it was only temporary. (Putnam Aff. ¶ 28.) The record demonstrates, however, that at least one of the employees worked for Solutions well after it began operations. (Time Sheet, October 3, 2012.)

The intermingling of operations and work in the manner evidenced by the record demonstrates that the two entities were not operating in an arm's-length relationship and that Solutions was nothing more than Systems by another name. *See Nat'l Labor Relations Bd. v. Kodiak Elec. Co.*, 70 F. App'x 664, 667-68 (4th Cir. 2003) (finding evidence of alter ego status where one entity performed work obtained by the other and shared employees, common space, ownership, and management); *Maryland Elec. Indus. Health Fund*, 289 F. Supp. 2d at 702-03

(finding evidence of alter ego status where two entities shared common owners, management, equipment, and employees, and had "considerable intermingling of the two companies' intra-office affairs" (internal quotation marks and citation omitted)); *Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. Budget Plumbing Corp.*, 111 F. Supp. 2d 716, 720-21 (D. Md. 2000) (finding evidence of single employer status where two entities shared employees, owners, offices, work, and communications systems).

Most of the defendants' attempts to dispute alter ego or single employer status constitute nothing more than mischaracterizations of the law or the record. Defendants claim Systems and Solutions cannot be said to have common ownership because Putnam is the sole owner of Solutions, while both he and Virginia Merrigan owned Systems. (Def.'s Opp'n at 25.) First, this claim in defendants' pleadings is belied by the record, which demonstrates that both were owners of both Systems and Solutions until March 2012 when Merrigan left both companies. (*See* Putnam Aff. ¶¶ 4-5; Putnam Aff. Ex. A.) Second, different ownership shares—in this case, Putnam's 80 percent share in Systems and now 100 percent share in Solutions—does not defeat a finding of alter ego status. *See Kodiak Elec. Co.*, 70 F. App'x at 667 (finding the first step of the Fourth Circuit's alter ego test satisfied where overlapping control of both entities existed despite different ownership); *Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund*, 111 F. Supp. 2d at 720 (finding indicia of common ownership where an individual had ownership shares, although of different amounts, in two companies). Defendants also claim the two entities did not share the same management because Virginia Merrigan was an officer of Solutions but not of Systems. The law only requires similarity in management, *Maryland Elec. Ind. Health Fund*, 289 F. Supp. 2d at 702, and it is undisputed that Putnam is an officer of and controls both

entities, and has been the sole officer of Solutions since only four months after it was incorporated. Defendants also claim that Solutions contracted with Systems' customers for new work. (Def.'s Opp'n at 26.) There is nothing in the record indicating that the contracts were for new work. All Putnam states in his affidavit is that Solutions negotiated new *contracts* with existing customers, not new *work*. (*See* Putnam Aff. ¶ 13.) In fact, as discussed above, the record indicates that new contracts Solutions attempted to negotiate were only for work Systems had been performing, and often Solutions performed work with no new contract at all. (Email to FHCC, and attached contract, ECF No. 28-5; Maryland Stadium Authority Email Regarding Systems Invoices, ECF No. 28-7; FHCC Emails, ECF No. 28-10, at 2; *see also* Putnam Aff. ¶ 30.) That Solutions eventually may have obtained new work, (*see* Putnam Aff. ¶ 34 (indicating Solutions bid on and was awarded new contracts in December 2012)), is not sufficient to overcome its alter ego status. An entity continuing under a new name cannot be rendered an entirely new and independent company simply because it later obtains new work in addition to the old.

The remaining facts on which defendants rely are insufficient to provide a reasonable trier of fact with any basis to conclude that Systems and Solutions are not alter egos. First, defendants claim the two companies had different business purposes because Systems focused on plumbing and pipefitting work in building projects, while Solutions focused on plumbing and pipefitting work on service and repair projects. (Def.'s Opp'n at 25-26; Putnam Aff. ¶¶ 11-12.) To be considered alter egos, two entities do not have to have identical business purposes, only substantially the same, or similar, business purposes. *Maryland Elec. Indus. Health Fund*, 289 F. Supp. 2d at 702-03. It is undisputed that Systems and Solutions both performed work in the

same industry, for the same customers, and with at least some of the same employees. Further, Putnam explains in his affidavit that Solutions' focus on service work is actually the result of wanting more government contracts. (Putnam Aff. ¶¶ 6, 11.) Courts have found that where two entities perform work in the same field, the fact that they have different types of customers does not defeat a finding of alter ego status. *Maryland Elec. Indus. Health Fund*, 289 F. Supp. 2d at 701 n.9 (citing *Maryland Elec. Indus. Health Fund v. Kodiak Elec. Co.*, Civ. No. 99-790, at *8 (D. Md. May 29, 2001)); *see also Carpenters' Pension Fund of Balt., Maryland v. Tao Constr. Co., Inc.*, 2010 WL 3733949, at *2 (D. Md. 2010) (finding that two corporations working in the same industry was indicative of alter ego status). Even accepting that the differences claimed by defendants exist, they are insufficient to provide a basis for finding different business purposes.

Second, defendants claim that Solutions has neither the same equipment[5] nor the same supervisors as Systems, and that the two entities are in fact operated differently because Solutions only performs work through subcontractors while Systems hired employees to do its work. (Def.'s Opp'n at 26-28.) Not only does the record demonstrate that Solutions did in fact have employees, (Putnam Aff. ¶ 28; Whiting-Turner Daily Field Report, ECF No 28-20 (listing that CAS had one employee on the worksite on June 1, 2012); Time Sheet, October 3, 2012; DiFranco Email to FHCC, May 4, 2012), but these facts are not enough to overcome the extensive evidence that Systems simply changed its name to Solutions and that Solutions then took on Systems' work and replicated its operations in other ways—sharing the same owners, officers, email addresses, physical address, paperwork, and contracts.[6] One of the "focal criteria" for finding alter ego status is "the ensuing degree of control that the employer exerts

---

[5] Richard Putnam claims in his affidavit that he learned in April 2012 that union members took Systems' tools and never returned them, damaged company equipment, and took trucks for personal use. (Putnam Aff. ¶ 25.)
[6] The court also notes that if all employees were removed from Systems' worksites due to a strike, it would seem to make sense that Systems/Solutions would have to hire subcontractors.

over the operations of the new employing entity." *Nat'l Labor Relations Bd. v. McAllister Bros., Inc.*, 819 F.2d 439, 444 (4th Cir. 1987). The facts demonstrate a sufficient degree of control to establish alter ego status, even with the use of subcontractors or the other minor differences defendants claim.

Finally, as required by the Fourth Circuit's alter ego test, shifting its corporate form provided Systems with a clear, reasonably foreseeable, and perhaps expected, benefit related to eliminating its labor obligations. *See Alkire*, 716 F.2d at 1020. Defendants admit that, at the time Solutions was incorporated, Systems was behind on its contribution payments to the Local 5 Funds and was facing an ongoing breach of the Settlement Agreement it had previously entered with the plaintiffs to pay delinquent contributions. (Putnam Aff. ¶¶ 20-21; Def.'s Opp'n Ex. 1.) By creating a new corporate entity, Putnam and Merrigan, as common owners, would have a means of continuing their work while evading their obligations under the CBA. The creation of a new entity just as Systems was facing increasing liability with respect to its contributions to the Local 5 Funds indicates alter ego status. *See Carpenters' Pension Fund*, 2010 WL 2010 WL 3733949 at *2 (finding the "expected or reasonably foreseeable benefit" test was satisfied where both entities were controlled by the same person and the new entity was incorporated while a lawsuit to recover contributions was pending); *Maryland Elec. Indus. Health Fund*, 289 F. Supp. 2d at 703 (finding the test was satisfied where the same individuals controlled both entities and the new entity was formed during pending litigation to collect delinquent contributions). Defendants attempt to counter this finding by pointing to Putnam's statement that "[w]hen [Solutions] was formed, the intention was . . . that it would qualify as a Minority Business Enterprise (MBE) and bid specifically on government contracts." (Putnam Aff. ¶ 5.) Even if

this was one of Putnam and Merrigan's intentions in creating Solutions, it remains reasonably

foreseeable that they also could evade their labor obligations.[7] *See McAllister Bros., Inc.*, 819

F.2d at 445 n.14 ("The imposition of alter-ego status under *Alkire* does not hinge on proof that

the employer intended to evade the labor laws.").

For all the foregoing reasons, Solutions and Systems are alter egos and single employers

and Solutions is jointly and severally liable for Systems' labor obligations. The court will

therefore enter summary judgment on this issue in favor of plaintiffs.

### C. Richard Putnam's Individual Liability

Plaintiffs seek to pierce Solutions' corporate veil and hold its sole owner, Richard

Putnam, individually liable for its obligations. Federal courts typically will disregard the

corporate form where doing so is required for "public convenience, fairness and equity."[8]

*Thomas v. Peacock*, 39 F.3d 493, 504 (4th Cir. 1994) (quoting *Alman v. Danin*, 801 F.2d 1, 3-4

(1st Cir. 1986)) (internal quotation marks omitted), *rev'd on other grounds*, 516 U.S. 349 (1996).

A court can pierce the corporate veil when "(1) the shareholder dominates and controls the

organization and (2) imposing such liability is needed to avoid injustice." *Mayes v. Moore*, 419

F. Supp. 2d 775, 781 (M.D.N.C. 2006) (citing *Thomas*, 39 F.3d at 504). In making the

determination, courts have looked at a number of factors, including "gross undercapitalization,

failure to observe corporate formalities, nonpayment of dividends, siphoning of the corporation's

funds . . . non-functioning of officers and directors, absence of corporate records, and the fact

that the corporation is merely a façade for the operation of the dominant stockholder." *Keffer v.*

---

[7] Merrigan, the owner essential for MBE status, left the company, and apparently gave up her ownership interest in it, only three months after incorporation. (Putnam Aff. ¶ 8; Putnam Aff. Ex. A.)

[8] Defendants claim state law governs the question of whether to pierce the corporate veil. The Fourth Circuit has indicated, however, that federal law governs the issue in ERISA cases. *Thomas*, 39 F.3d at 503. In any event, applying Maryland law would not change the outcome in this case for reasons apparent in the body of this memorandum. *See Ramlall v. MobilePro Corp.*, 30 A.3d 1003, 1009 (Md. App. 2011) ("[W]e may pierce the corporate veil . . . only based on fraud or proof that it is necessary to enforce a paramount equity.")

*H.K. Porter Co., Inc.*, 872 F.2d 60, 65 (4th Cir. 1989) (citing *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685-87 (4th Cir. 1976)); *Mayes*, 419 F. Supp. 2d at 781. The Fourth Circuit has made clear that courts must be cautious in deciding to pierce the corporate veil, but not hesitate to do so where justice requires. *Keffer*, 872 F.2d at 64.

Plaintiffs bear the burden of establishing a basis for disregarding the corporate form, *DeWitt Truck Brokers*, 540 F.2d at 683, but have failed to do so here. Most importantly, plaintiffs have failed to identify any unfairness or injustice that would occur should the court defer to the corporate entity. Courts typically find unfairness where the dominant shareholder used the corporation improperly or rendered the corporation unable to pay its obligations. *See Keffer*, 872 F.2d at 65 (finding the district court properly found fundamental unfairness where the shareholder had sold off the insolvent corporation's assets and kept the proceeds for itself); *cf. Mayes*, 419 F. Supp. at 782 (finding no grounds for piercing the corporate veil where there was no evidence the shareholder had fraudulently or unfairly used the corporate form). Plaintiffs claim it would be unfair to uphold the corporate form in this case because Solutions has failed to maintain records demonstrating that it is, in fact, a corporation. Yet, in support of their claim, the plaintiffs only cite cases in which courts found piercing the veil was required to prevent injustice because individual shareholders had operated the corporation for their sole benefit and to the detriment of the corporation's obligations. *See DeWitt*, 540 F.2d at 689 (finding equity and fundamental justice supported individual liability where the shareholder was claiming the company was making payments it was not making, and in fact could not make, while he was withdrawing large sums in salary); *Trustees of the Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 460 (E.D. Pa. 2001) (finding fundamental unfairness where the court also found

undercapitalization and a siphoning of funds by the sole shareholder during times of financial distress).  Plaintiffs have provided no evidence to demonstrate Putnam engaged in similar conduct here.

Although the failure to provide evidence of injustice disposes of the issue, plaintiffs have also failed to provide any evidence of undercapitalization, siphoning, failure to pay dividends, non-functioning of officers and directors, or other evidence that Solutions is a sham corporation—for example, evidence that Putnam holds title to Solutions' necessary assets or that Solutions was not performing the work claimed, *see Trustees of Nat'l Elevator Industry Pension*, 140 F. Supp. 2d at 460.  Plaintiffs have only offered evidence that Solutions lacked corporate records, including records demonstrating that it held liability insurance and records demonstrating that it had a bank account—although they offer no evidence that Solutions was using Putnam's bank account.  (*See* Solutions' Supp. Doc. Produc. Resp., ECF No. 28-16.)  The mere lack of corporate records alone, only one of the many *Keffer* factors, cannot provide a basis for piercing the corporate veil.  The court will deny plaintiffs' request for summary judgment on this issue.

## II.      Unpaid Contributions, Liquidated Damages and Interest

Because plaintiffs have established that Systems—and Solutions as its alter ego—faced obligations to make benefit fund contributions under the CBA and Trust Agreements, plaintiffs are entitled to damages as set forth under ERISA, 29 U.S.C. § 1132(g)(2), where the defendants breached those obligations.  Plaintiffs claim unpaid contributions, liquidated damages, and interest for three distinct time periods.  For each time period, defendants raise different challenges to liability or the accuracy of the calculations.  The court will therefore address each

time period and the parties' corresponding claims in turn.

### A. Delinquent contributions sought pursuant to the payroll audit, January 2008-July 2011.

Plaintiffs claim $118,363.43 in unpaid contributions for the period from January 2008 through July 2011 that were revealed by an audit conducted of Systems' payroll records.[9] (Killeen Decl. ¶ 10; Killeen Decl. Exs. 6, 7, ECF Nos. 28-28, 28-29.)  Plaintiffs arrived at this amount by subtracting payments made pursuant to a previous settlement agreement from the total amount of delinquent contributions found due by the audit.  (Pl.'s Mem., ECF No. 28-1, at 10.)  Defendants claim they cannot be held liable for this amount for two reasons: first, because some employees included in the audit were not covered by the agreement or were not performing covered work; and second, because the plaintiffs are barred from collecting any amounts for the time period covered by the previous settlement agreement.  (Def.'s Opp'n at 14-15, 18.)  Both of the defendants' arguments fail.

The Trust Agreements authorized those managing the Local 5 Funds to designate a qualified representative to conduct an audit of Systems' payroll and wage records to determine if Systems was making full contribution payments as required by the CBA.  (*E.g.*, Trust Agreements at 4.)  Plaintiffs have provided an audit which demonstrates the amount owed to each fund, for each employee, for the years 2008 through 2011.  (Coyle Decl. Ex. A.)  Where an employer's obligation to pay delinquent contributions is based on the results of an audit, courts typically find summary judgment appropriate unless the employer has identified specific errors or provided documentation to rebut the audit's conclusions.  *See, e.g.*, *Maryland Elec. Ind.*

---

[9] The audit was conducted of Systems' records going back to January 2008, but it did not reveal any delinquent contributions until November 2008.  Further, because the Letter of Assent was only effective from September 22, 2008, Systems would not have had any obligations to make contributions under ERISA before then.

*Health Fund v. MESCO, Inc.*, 2014 WL 853237, at *14 (D. Md. 2014); *Nat'l Elec. Benefit Fund v. Rabey Elec. Co., Inc.*, 2012 WL 3854932, at *4 (D. Md. 2012).  Defendants' only claim of error is that the audit includes employees who were not performing covered work, and the only factual evidence they provide to support the claim is a statement in Putnam's affidavit.  (Putnam Aff. ¶ 38.)  There, he lists three employees and explains that they were not performing covered work because one was not a member of Local 5, one was an "office employee" and not a member of Local 5, and one Putnam recalled was "not a covered employee," but he could not confirm what position the employee did hold.  (*Id.*)  Mr. Putnam's statement, however, is not sufficient to raise a genuine issue of fact as to the accuracy of the audit such that summary judgment is inappropriate.

In considering whether an employer has identified a specific error in the audit as to which employees were eligible for contributions, courts have looked to the governing collective bargaining and trust agreements.  *See Nat'l Elec. Benefit Fund*, 2012 WL 3854932 at *4-5.  "[C]ollective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy."  *Keffer*, 872 F.2d at 62.  As with any contract, however, courts begin by looking at the language of the agreement for any "clear manifestation of the parties' intent."  *Id.*  The CBAs governing the relevant time period in this case include a "Wages and Fringes" chart listing agreed-upon contributions for journeymen and apprentices.  (CBAs at 7-8, 15-16.)  Other sections of the CBAs indicate that employers are obligated to make contributions "[f]or all hours worked by all employees whose wages are covered by this [CBA]" or "for each employee in each classification listed in the amount shown in [the Wages and Fringes table]."  (*Id.* at 11-12.)  Defendants point to no evidence that the obligation to make

contributions turns on union membership.  If anything, it appears from the language of the CBA

that it turns on job classification.  *See Nat'l Elec. Benefit Fund*, 2012 WL 3854932 at *4-5

(finding a similarly worded CBA did not make distinctions based on unionized or non-unionized

employees).  Further, defendants point to no evidence that being an "office employee," whatever

that may entail, bars an employee from also being considered a journeyman or apprentice, or that

such work did not involve covered work that would render the individual a covered employee.[10]

Finally, Mr. Putnam's admission that he does not remember what Jeffrey Wink did does not

operate to identify a specific factual error in the audit.  For all of these reasons, no genuine

dispute of fact exists as to the accuracy of the audit.

Apart from defendants' challenge to certain employees included in the audit, they also

claim the Settlement Agreement bars plaintiffs from collecting delinquent contributions

attributed to the time period also covered by the Agreement.  (*See* Settlement Agreement ¶ 2.)

According to the defendants, granting summary judgment would amount to providing plaintiffs

double recovery.  (Def.'s Opp'n at 14.)  Further, the defendants claim that, even if the Settlement

Agreement does not preclude recovery, the plaintiffs' calculations do not demonstrate an off-set

for the amounts Systems did pay under the Agreement.  (*Id.* at 15.)

First, the Settlement Agreement does not preclude recovery on the basis of the audit.  In

fact, under the Agreement, the parties acknowledged that the audit at issue was taking place and

agreed that nothing in the Agreement was to be construed as preventing the Local 5 Funds from

bringing an action for delinquent contributions for any period of time covered by the Agreement.

(Settlement Agreement ¶ 10.)  Defendants appear to admit this.  (Opp'n at 3 ("Under the

---

[10] The court notes that it appears Systems included Keith Brunner, the alleged "office employee," as a covered employee on remittance reports submitted after the period covered by the audit.  (*See* Killeen Decl. Ex. 3, ECF No. 28-25.)

agreement, the parties recognized that the audit for the period of January 2008 through the then current date was not included in any manner in terms of the Settlement Agreement.").)  In addition, although Systems agreed to pay a certain amount to satisfy its contribution obligations for the covered time period, it also agreed that the entire amount would be immediately due and payable should Systems "fail[ ] to abide by each and every term of [the] Settlement Agreement." (*Id.* ¶ 4.)  Further, the Local 5 Funds did not release claims arising from Systems' failure to satisfy the obligations of the Agreement, which included its responsibility to submit reports and pay contributions in the future, or where it was discovered Systems submitted inaccurate or incomplete reports.  (*Id.* ¶ 9.)  Defendants admit that Systems did not comply with the terms of the settlement.  (Def.'s Opp'n Ex. 1, ECF No. 35-2, at 1 (listing the ways in which Systems had not complied with its obligations).)  Systems cannot seek the protections of the Agreement while failing to meet its obligations under it.  Under the terms of the Agreement, therefore, the Local 5 Funds are not barred from recovering all delinquent contributions revealed by the audit, even those that accrued during the period of time covered by the Settlement.

Second, contrary to the defendants' assertions, the plaintiffs have incorporated an off-set for collections they made pursuant to the Settlement Agreement, as they are seeking only $118,363.43 instead of the full $168,790.76 in delinquent contributions revealed by the audit. (*See* Pl.'s Mem. at 10; *compare* Coyle Decl. ¶ 4; *with* Killeen Decl. Exs. 6, 7.)  The defendants have not offered any facts to demonstrate that the amount discounted does not accurately reflect the payments Systems made pursuant to the Agreement.  Defendants cannot manufacture a genuine dispute of fact by baldly asserting the amounts claimed from the audit are wrong and only offering as proof the fact that the time period covered by the audit overlaps with that

covered by the Settlement Agreement. Such a fact provides no grounds on which a reasonable trier of fact could find that the discounts plaintiffs claimed to have applied are not an accurate reflection of what is due.

Because there is no genuine dispute of material fact as to the amount of unpaid contributions defendants owe under the audit, summary judgment will be granted in favor of the plaintiffs for $118,363.43 in unpaid contributions for the period of January 2008 through July 2011.

**B. Contributions sought for unfunded reports, August through October 2011.**

Plaintiffs claim $87,124.50 in delinquent contributions for the period of August through October 2011. (Pl.'s Mem. at 10.) The undisputed evidence demonstrates that, for that time period, Systems did submit remittance reports to the Local 5 Funds delineating the contributions due, but never actually paid them. (Killeen Decl. ¶ 11; Killeen Decl. Ex. 3.) Defendants in no way dispute these facts and summary judgment will be granted in favor of plaintiffs for $87,124.50 in unpaid contributions.

**C. Contributions sought pursuant to the Funds' projections, November 2011 through May 2013.**

Plaintiffs claim $441,216.35 in delinquent contributions for the period of November 2011 through May 2013. (Pl.'s Mem. at 11.) The Local 5 Funds claim this amount on the basis of the estimating provisions in the Trust Agreements. The Trust Agreements authorize the trustees to project delinquent contributions when an employer fails to make contributions for two or more months and has not submitted documents showing the employees who worked for the employer

and the hours they worked.[11]  (*E.g.*, Trust Agreements at 6-7.)  The Trust Agreements differ

slightly, however, as to how the delinquencies are to be projected.  For example, the Medical

Fund allows the trustees to project delinquent contributions as the greater of either 1) "the

average of the monthly payments *actually made* by the Employer for the last [three] months for

which payments were made and/or unfunded remittance reports received," or 2) "the average of

the *monthly payments made* by the Employer for the last [twelve] months for which payments

were made and/or unfunded remittance reports received."  (*Id.* (emphasis added); *see also id.* at

31-32 (Retirement Savings Fund); NPF & ITF Trust Agreements, Killeen Decl. Ex. 8, ECF No.

28-30, at 12 (National Pension Fund).)  The Apprenticeship Fund, on the other hand, allows the

trustees to project the contributions as the greater of either 1) "the average of the *monthly hours*

*reported* by the Employer for the last [three] months for which payments were made and/or

unfunded remittance reports received," or 2) "the average of the *monthly hours reported* by the

Employer for the last [twelve] months for which payments were made and/or unfunded

remittance reports received."  (Trust Agreements at 12-13 (emphasis added); *see also id.* at 18

(Communications and Productivity Fund), 24-25 (Vacation Fund); NPF & ITF Trust Agreements

at 6-7 (International Training Fund).)  All of the Trust Agreements provided state that the

projection can be used to determine payments due for each delinquent month in a lawsuit, and

that "no other proof need be furnished by the trustees to any court or arbitrator to compute the

total payments due from the Employer for all delinquent months."  (*Id.*)

Defendants claim plaintiffs are not entitled to summary judgment because the plaintiffs

have failed to identify which estimating method they used and how they calculated the claimed

amounts, thus creating a genuine dispute as to the accuracy of the estimations.  (Def.'s Opp'n at

---

[11] There is no evidence that the Industry Fund allows projections as the Trust Agreement for the fund is not in the record.

16-17.) The court agrees that the defendants have raised a genuine dispute of fact as to the accuracy of the estimations with respect to all of the funds except for the International Training Fund. Plaintiffs claim the projected monthly contribution for all funds is the average of the contributions reported, but never paid, for August through October 2011, which are the last three months for which Systems submitted remittance reports. (Reply, ECF No. 36, at 12-13.) Although this methodology is authorized by some of the Trust Agreements, (*see, e.g.*, Trust Agreements at 18 (Communications and Productivity Fund)), it is not authorized by those that state projections must be based on months in which payments were actually made—Systems made no payments in August through October 2011. *See Trustees of the Nat'l Automatic Sprinkler Indus. Welfare Fund v. Advanced Safety, Inc.*, 2011 WL 1557918, at *3 (D. Md. 2011) (finding a plaintiff benefit fund failed to prove it was entitled to unpaid contributions based on its provided projections where the projections were based on rates for months in which the employer made no payments and the relevant trust agreement allowed projections based on "the average for the monthly payments *actually made* by the Employer" (emphasis added)). Further, even if all the Trust Agreements allowed the trustees to project based only on the last three reports submitted, the court cannot tell from the numbers provided for the funds, other than the National Pension Fund and the International Training Fund, that it is actually how plaintiffs arrived at their estimations. The monthly average of the contributions for August through October 2011, as reported in the remittance reports in Exhibit 7 to Trustee and Local 5 Business Manager James Killeen's declaration, for example, is $19,553.63. (*See* Killeen Decl. Ex. 7; *see also* Killeen Decl. Ex. 6 (listing the claimed contributions for the unfunded reports submitted to the trustees in August through October 2011).) This is different from the monthly average

plaintiffs claim, based on their projections, of $16,059.48. (Killeen Decl. Ex. 6.) Summary judgment will be denied, therefore, for projected contributions the plaintiffs seek for all funds except the International Training Fund.

Summary judgment also will be denied for the contributions the plaintiffs seek for the International Training Fund for April 2012 and after. The defendants have raised a genuine issue of fact as to whether or not the defendants had an obligation to make contributions during that period. The CBA only requires employers to make contributions for hours worked. (CBA at 23 (¶ 166).) Both parties agree that members of Local 5 were directed to stop working for Systems beginning in early 2012. (*See* Putnam Aff. ¶¶ 21-24; Pl.'s Reply at 11.) The parties appear to disagree, however, as to whether this occurred in March or May. (*Compare*, Putnam Aff. ¶ 24 (noting all workers had been removed by mid-March),[12] *with* Reply at 11 (noting all workers were removed in May).) Although the International Training Fund's Trust Agreement allows the trustees' projections to provide the sole proof of delinquent contributions, it does not make such proof irrefutable. Here, plaintiffs admit that covered employees were not working for the defendants beginning in May 2012. If no covered employees were performing work, under the terms of the CBA, the defendants would not have an obligation to make contributions, even if they still had an obligation to submit reports. Plaintiffs are not entitled, therefore, to summary judgment for delinquent contributions for the period in which they admit covered employees were not actually working. Because there is a genuine dispute as to whether employees stopped working in March or May, the court will deny summary judgment for all times after March 2012.

As to the remaining estimations made for the International Training Fund for November 2011 through March 2012, (*see* Killeen Decl. Ex. 7 at 3), the plaintiffs are entitled to summary

---

[12] The court notes that the plaintiffs do not challenge the admissibility of this statement in Mr. Putnam's affidavit.

judgment. There is no dispute Systems did not supply reports or payments for that period, despite its obligation to do so, (*see* Def.'s Opp'n at 5 (admitting Systems did not provide reports for November 2011 through March 2012)), and the estimations match the records provided and the projection procedures authorized by the Trust Agreement. The court will thus grant summary judgment in favor of the plaintiffs for $849.35, the amount they seek in contributions for the period of November 2011 through March 2012 for the International Training Fund. (Killeen Decl. Ex. 7 at 3.)

### D. Liquidated Damages and Interest

Plaintiffs seek $89,615.82 in liquidated damages and $85,675.36 in interest on the unpaid contributions. (Pl.'s Mem. at 11-12.) When courts enter judgment in favor of a benefit plan to enforce an employer's obligations to make contribution payments, ERISA provides that courts must also award interest and the greater of either the interest or liquidated damages, as provided for in the governing plans. 29 U.S.C. § 1132(g)(2). Defendants do not dispute that the Trust Agreements for the National Pension Fund and the International Training Fund provide for interest at a rate of twelve percent per annum and liquidated damages of ten percent and twenty percent, respectively. (Killeen Decl. ¶¶ 18, 21.) The defendants do not dispute that the remaining Trust Agreements provide for interest at a rate of ten percent per annum and liquidated damages of twenty percent. (*Id.* ¶¶ 12, 15.)

As a preliminary matter, because the court is not granting summary judgment for the plaintiffs with respect to the contributions they seek for November 2011 through May 2013 for the Medical Fund, Industry Fund, Vacation Fund, Communications and Productivity Fund, Apprenticeship Fund, Retirement Savings Fund, and National Pension Fund, or with respect to

the contributions they seek for April 2012 through May 2013 for the International Training Fund, plaintiffs are not at this time entitled to liquidated damages or interest with respect to those contributions. Only $25,666.56 in liquidated damages and $43,775.66 in interest, therefore, remain at issue.

As to these remaining amounts, the defendants' only dispute is that the December 2010 Settlement Agreement bars recovery of any damages related to the period of time covered by the Agreement. For the same reasons the Settlement Agreement does not bar recovery of unpaid contributions, however, it does not bar recovery of liquidated damages and interest. *See* Part II.A *supra.* Further, to the extent defendants are relying on the Local 5 Funds' waiver of liquidated damages under the terms of the Agreement, that waiver became ineffective as soon as Systems failed to comply with its obligations under the Agreement. (*See* Settlement Agreement ¶ 4.) With no genuine dispute as to liquidated damages and interest for January 2008 through October 2011, and, for the International Training Fund, for November 2011 through March 2012, the court will grant summary judgment in plaintiffs' favor for $25,666.56 in liquidated damages and $43,755.66 in interest. Summary judgment will be denied with respect to the remaining liquidated damages and interest at issue.

## CONCLUSION

For the reasons stated above, summary judgment will be granted in part for the plaintiffs, as to unpaid contributions, liquidated damages, and interest for the period of January 2008 through October 2011, and, for the International Training Fund, for November 2011 through

March 2012, and as to Solutions and Systems' joint and several liability. Summary judgment is otherwise denied. A separate order follows.


<u>March 28, 2014</u>                                  /s/

        Date                                    Catherine C. Blake

                                            United States District Judge